# 25-951-CR

## United States Court of Appeals

*for the*

## Second Circuit

UNITED STATES OF AMERICA,

*Appellee,*

– v. –

JUAN HERNANDEZ,

*Defendant-Appellant.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## BRIEF FOR DEFENDANT-APPELLANT

STEVE ZISSOU, ESQ.
*Attorney for Defendant-Appellant*
42-40 Bell Boulevard, Suite 302
Bayside, New York 11361
(718) 541-0716

# TABLE OF CONTENTS


TABLE OF CONTENTS ........................................................................ i

TABLE OF AUTHORITIES ................................................................... iii

JURISDICTIONAL STATEMENT ........................................................... 1

PRELIMINARY STATEMENT AND STATEMENT OF THE CASE .................. 2

STATEMENT OF THE ISSUES PRESENTED FOR REVIEW ........................... 4

STATEMENT OF THE FACTS AND PROCEDURAL HISTORY ....................... 5

A. Appellant's Arrest on a Sole Count of Violating 18 U.S.C. § 371 ................ 5

B. The Guilty Plea ........................................................................ 5

C. The Shock of the Restitution Order at Sentencing ................................ 9

D. Appellant Files Motion for Reconsideration ...................................... 11

E. A Remand—and a Recusal ............................................................ 11

SUMMARY OF ARGUMENT ................................................................ 15

I. APPELLANT WAS DENIED CONSTITUTIONALLY EFFECTIVE ASSISTANCE OF COUNSEL IN VIOLATION OF THE SIXTH AMENDMENT. ........................................................................ 16

A. Standard of Review .................................................................... 16

B. Constitutionally Ineffective Assistance of Counsel Led to the Issuance of an Improper Restitution Order ...................................... 17

C. The Failure to Notify Appellant of the Possibility of a Restitution Order Was Not Harmless .................................................................. 18

II. GILEAD IS NOT A "VICTIM" ENTITLED TO RESTITUTION UNDER THE MVRA, AND THE DISTRICT COURT VIOLATED APPELLANT'S FIFTH AMENDMENT DUE PROCESS RIGHTS BY IMPOSING A RESTITUTION ORDER BASED ON A THIRD-PARTY

CLAIM OF WHICH APPELLANT RECEIVED NO NOTICE AND HAD NO MEANINGFUL OPPORTUNITY TO CONTEST. ....20

A. Standard of Review ....21

B. The MVRA Vests Exclusive Authority in the Government ....21

C. The Government's Exclusive Role Serves Critical Functions ....23

D. The MVRA's Legislative History Confirms Congress's Intent to Centralize Restitution Authority in the Government....24

III. THE DISTRICT COURT EXCEEDED ITS AUTHORITY BY ORDERING RESTITUTION IN AN AMOUNT GREATER THAN THE $16,000 TO WHICH APPELLANT SPECIFICALLY AGREED IN HIS PLEA AGREEMENT, WHERE NO OPEN-ENDED RESTITUTION PROVISION WAS INCLUDED. ....26

A. Standard of Review ....26

B. The Government Waived Any Right to Seek Additional Restitution....27

C. Gilead's Claim Fails on the Merits ....29

1. Appellant's Case is Plainly Distinguishable from *Papyan* ....32

2. Appellant's Case is Plainly Distinguishable from *Milstein* ....36

3. Both Cases, Taken Together, Mean the MVRA Does Not Apply....38

4. *United States v. Seabrook* Directly Controls This Case....40

D. Gilead's Claims Are Speculative ....41

E. Gilead's Admission of Extensive Kickback Violations Undermines Any Claim to Victim Status ....46

F. To Address This Error, this Court Should Vacate the Conviction and Remand to the District Court....49

CONCLUSION ....51

# TABLE OF AUTHORITIES

## CASES

*Gilead Sciences, Inc.*, *et al. v. Khaim, et al.*,
Case No. 24 Cv. 4259 (E.D.N.Y. 2024) ............................................................30

*Hughey v. United States*, 495 U.S. 411, 420 (1990) ........................................22, 46

*In re Rendon Galvis*, 564 F.3d 170, 175 (2d Cir. 2009).........................................25

*Mathews v. Eldridge*, 424 U.S. 319, 333 (1976) ....................................................18

*New Hampshire v. Maine*, 532 U.S. 742, 749 (2001) ............................................28

*Santobello v. New York*, 404 U.S. 257 (1971).........................................................28

*Strickland v. Washington*, 466 U.S. 668 (1984) ...............................................16, 17

*United States et al., ex rel. Dr. Paul Bellman v. Gilead Sciences, Inc.*,
Case No. 16 Cv. 6228 (PAE) (S.D.N.Y. 2025) ..................................................48

*United States v. American Society of Composers, Authors & Publishers*, 627 F.3d
64, 72 (2d Cir. 2010) ............................................................................................21

*United States v. Aminov, et al*, Case No. 23 Cr. 110 (MKV)
(S.D.N.Y. 2025) (*Hernandez*) .......................................................................passim

*United States v. Aumais*, 656 F.3d 147, 153 (2d Cir. 2011)...................................43

*United States v. Avenatti*, 81 F.4th 171, 204 (2d Cir. 2023),
cert. denied, 144 S. Ct. 2598 (2024).....................................................................40

*United States v. Boccagna*, 450 F.3d 107, 113 (2d Cir. 2006)...............................21

*United States v. Cadet*, 664 F.3d 27, 34–35 (2d Cir. 2011) ..................................22

*United States v. Calderon*, 944 F.3d 72, 95 (2d Cir. 2019)....................................43

*United States v. Camara*, 175 F.3d 1008 (2d Cir. 1999) (unpublished) ...........50, 52

*United States v. Catoggio*, 326 F.3d 323, 328 (2d Cir. 2003)................................30

*United States v. Colon*, 220 F.3d 48, 51 (2d Cir. 2000) .........................................27

*United States v. Goodrich*, 12 F.4th 219, 228–29 (2d Cir. 2021) ...........................28

*United States v. Gushlak*, 728 F.3d 184, 190 (2d Cir. 2013) .................................21

*United States v. Helmsley*, 941 F.2d 71, 101 (2d Cir. 1991) ..................................22

*United States v. Khan*, 857 F.2d 85, 87-88 (2d Cir. 1988) .....................................19

*United States v. Matos*, 905 F.2d 30, 32 (2d Cir. 1990) .........................................17

*United States v. Milstein*, 401 F.3d 53 (2d Cir. 2005) (*Milstein I*) .........................38

*United States v. Milstein*, 481 F.3d 132 (2d Cir. 2007) *(Milstein II*) ....32, 37, 38, 39

*United States v. Oladimeji*, 463 F.3d 152, 158 (2d Cir. 2006) ...............................22

*United States v. Padilla*, 186 F.3d 136, 140 (2d Cir. 1999) ...................................27

*United States v. Papyan*, Case No. 18 Cr. 533 (RS),
2024 WL 4876945 (N.D. Cal. 2024) .....................................................................32

*United States v. Pescatore*, 637 F.3d 128, 138 (2d Cir. 2011) ...............................31

*United States v. Ready*, 82 F.3d 551, 558-59 (2d Cir. 1996) .................................27

*United States v. Reifler*, 446 F.3d 65, 121 (2d Cir. 2006) ......................................30

*United States v. Riera*, 298 F.3d 128, 133 (2d Cir. 2002) ......................................27

*United States v. Seabrook*, 968 F.3d 224 (2d Cir. 2020) ............................41, 42, 49

*United States v. Showerman*, 68 F.3d 1524, 1528 (2d Cir. 1995) ..............20, 51, 52

*United States v. Stoerr*, 695 F.3d 271 (3rd Cir. 2012) ...........................................22

*United States v. Sullivan*, 118 F.4th 170 (2d Cir. 2024) .........................................25

## STATUTES

18 U.S.C. § 2320(a) .......... 37

18 U.S.C. § 3663 .......... 39

18 U.S.C. § 3663A .......... passim

18 U.S.C. § 3664(e) .......... 29

18 U.S.C. § 371 .......... passim

18 U.S.C. § 3771 .......... 24, 25

21 U.S.C. § 331(a) .......... 37

21 U.S.C. § 331(t) .......... 33, 37

21 U.S.C. § 333(a)(2) .......... 37

21 U.S.C. § 333(b)(1)(D) .......... 33

21 U.S.C. § 353(e)(1) .......... 33, 37

21 U.S.C. § 353(e)(2)(A) .......... 37

28 U.S.C. § 2255 .......... 16

42 U.S.C. § 1320a-7b(b)(2)(B) .......... 30, 36, 39

## TREATISES

*Federal Criminal Restitution* § 15:10 (2024) .......... 26

## JURISDICTIONAL STATEMENT

This appeal is from a restitution order of the United States District Court for the Southern District of New York, which had jurisdiction under 18 U.S.C. § 3231. Judgment was entered on April 7, 2025. *United States v. Boris Aminov, et al*, Case No. 23 Cr. 110 (MKV) (S.D.N.Y.) (henceforth referred to as "*Hernandez*"), ECF 469. Appellant filed a notice of appeal on April 15, 2025. *Hernandez*, ECF 473. This Court has jurisdiction under 28 U.S.C. § 1291.

## PRELIMINARY STATEMENT AND STATEMENT OF THE CASE

Appellant-Defendant Juan Hernandez was a delivery driver. He carried paper bags containing medications—and small amounts of cash—to patients in New York City. He did not own a pharmacy, did not process prescriptions, did not create false documents, and did not launder money. He knew that paying people to use particular pharmacies was wrong, and he admitted as much. He was the ninth of eleventh defendants, a very minor player in a scheme larger than himself. For his conduct, he accepted responsibility, pleaded guilty, and agreed to pay $16,000 in restitution.

On January 24, 2025, Gilead Sciences, Inc., Gilead Sciences Ireland UC, and Gilead Science Ireland UC (collectively, "Gilead" or the "Gilead entities") filed a memorandum seeking $2,388,872.78 in restitution from Appellant. The filing claimed that Appellant, as a "coconspirator," was responsible for 866 bottles of Gilead-branded medication dispensed by a single pharmacy. Appellant was never told. On February 11, 2025, the District Court issued a scheduling order directing the parties to respond to Gilead's submission by February 26, 2025. Defense counsel did not respond. He did not advise his client that a third party was seeking over $2 million. He did not investigate the claim, request an adjournment, or file a single page of opposition. The Government, for its part, did not endorse Gilead's claim. In its sentencing memorandum dated March 31, 2025, the Government identified only

two categories of victims: "government insurance programs and the patients of the pharmacies." Gilead was not mentioned.

The plea agreement contained no open-ended provision subjecting Appellant to additional restitution "as determined by the Court." The $16,000 figure was the bargain. Appellant paid it in advance of sentencing.

He was sentenced to pay $2,388,872.78.

For the reasons set forth below, it is respectfully submitted that the District Court's Restitution Order be vacated, or that the underlying conviction itself be vacated so that, *inter alia*, the District Court can reconsider its Restitution Order.

## STATEMENT OF THE ISSUES PRESENTED FOR REVIEW

1. Whether Appellant was denied effective assistance of counsel in violation of the Sixth Amendment.

2. Whether Gilead qualifies as a "victim" entitled to restitution under the MVRA—where the Government identified only "government insurance programs and the patients of the pharmacies" as victims of Appellant's offense, and where Gilead's claimed losses arise from an alleged counterfeiting scheme for which Appellant was neither charged nor convicted—and whether the District Court violated Appellant's Fifth Amendment due process rights by imposing a restitution order based on a third-party claim of which appellant received no notice and had no meaningful opportunity to contest.

3. Whether the District Court exceeded its authority by ordering restitution in an amount greater than the $16,000 to which Appellant specifically agreed in his plea agreement, where no open-ended restitution provision was included.

## STATEMENT OF THE FACTS AND PROCEDURAL HISTORY

Only those facts necessary and relevant to this appeal will be included herein—which necessitates a detailed explanation of the unusual procedural history of this case.

A. Appellant's Arrest on a Sole Count of Violating 18 U.S.C. § 371

Appellant-Defendant Juan Hernandez was arrested on October 24, 2023, the ninth of ten defendants listed on a superseding indictment in *United States v. Boris Aminov, et al*, Case No. 23 Cr. 110 (MKV) (S.D.N.Y.) . *See Hernandez*, ECF 88. Appellant was not mentioned in the previous indictment. An eleventh defendant was added in a second superseding indictment later the same day. ECF 96.

On September 6, 2024, Appellant pleaded guilty to a single count of conspiring to violate the Anti-Kickback Statute, in violation of 18 U.S.C. § 371. This was the sole count on which he had been indicted.

B. The Guilty Plea

Appellant pleaded guilty pursuant to a plea agreement, which he reviewed ahead of sentencing with counsel. Plea Agreement, A. 106-112; Affidavit ¶ 5, A. 224.[1]

During his allocution, in answer to questions from the Court, Appellant made plain that he did not have a grasp of the larger scheme described in the Superseding

[1] "A." refers to the Appendix filed as part of this appeal.

Indictment. Counsel explained to the Court, after speaking with Appellant, that "we have sort of talked about his intentions at the time of the offense," and that Appellant

> earnestly believed that delivering drugs to—delivering pharmaceuticals to patients was an honorable job in helping the individuals. But he is prepared and will respond to questions from Your Honor concerning knowing that the provision of the money to induce the patients to go to certain pharmacies, as well as the purchasing back of certain medications from patients, was wrong and illegal.

Plea Tr. at 43; A. 155. When asked by the Court to explain what he did, specifically, he replied, "I would tell people, hey, come to this pharmacy." *Id*. at 45. When asked to specify the pharmacy, Appellant replied, "Whatever pharmacy they was [sic] using, whatever pharmacy that person was using. The ones that's on the paper." *Id*. After clarifying that the pharmacy in question was Family Pharmacy, the Court asked if he "[knew] that place," and Appellant replied, "No, I didn't," explaining that the man he worked for "gave [him] stuff to deliver." *Id.* at 46; A. 158.

The Court continued.

> THE COURT: So just to be sure I understand, you delivered medications to certain people that you knew were patients; is that right?
>
> THE DEFENDANT: Yes. On the bag, it had the person address and where to deliver it to, the person's name, and you go there and you deliver it.

> THE COURT: But in addition to delivering the drugs, you gave them money?
>
> THE DEFENDANT: It was in the bag.
>
> THE COURT: But you knew there was money in the bag?
>
> THE DEFENDANT: Yes.
>
> THE COURT: And you knew the purpose of that money was to get them to purchase their drugs from certain pharmacies?
>
> THE DEFENDANT: Yes.
>
> THE COURT: Did you know why?
>
> THE DEFENDANT: No.
>
> THE COURT: Did you know that it was wrong to do that?
>
> THE DEFENDANT: Yes.
>
> THE COURT: You knew that that was illegal?
>
> THE DEFENDANT: Yes.
>
> MR. SOBELMAN: Your Honor, in the government's view, that's a sufficient allocution.

*Id.* He also acknowledged that, on one or two occasions, he bought HIV medication back from patients that had otherwise been prescribed to them by their doctors. *Id.* at 44; A. 156. "I tried to sell it somewhere else and couldn't sell it," he explained, "so I ended up throwing it in the garbage." *Id.*

The only restitution of which Appellant was made aware prior to sentencing was the restitution specified in the plea agreement: $16,000. Affidavit ¶ 8; A. 225. This was the same amount about which he was questioned at the change of plea.

> THE COURT: Do you understand that as part of your plea agreement, you have agreed to forfeit to the United States a sum of money equal to $16,000 in United States currency representing proceeds traceable to the commission of the offense charged?
>
> THE DEFENDANT: Yes, ma'am.
>
> THE COURT: Do you understand that any amount of forfeiture will not reduce any fine, restitution, costs of imprisonment, or any other penalty that the Court may impose?
>
> THE DEFENDANT: Yes, ma'am.
>
> THE COURT: And do you understand that as part of your plea agreement, you have also agreed separately to make restitution in the amount of $16,000, in accordance with 18, United States Code, Section 3663, 3663A, and 3664?
>
> THE DEFENDANT: Yes, ma'am.

Plea Tr. at 32-33; A. 144-145. Separately, the Court asked a related question about forfeiture.

> THE COURT: Do you admit the forfeiture allegation with respect to Count Two?
>
> THE DEFENDANT: Yes.

> THE COURT: Do you admit the restitution allegation with respect to Count Two?
>
> THE DEFENDANT: Yes.
>
> THE COURT: Does the government wish any further factual matter to be addressed in connection with this plea allocution?
>
> MR. SOBELMAN: No, your Honor.

Plea Tr. at 48; A. 160. Appellant had read the plea agreement carefully, and so, in the hearing, when he was questioned about the forfeiture allegations with respect to Count Two, he recalled the language he had previously reviewed in the agreement.

> The defendant hereby admits the forfeiture allegations with respect to Count Two of the Superseding Indictment and agrees to forfeit to the United States, pursuant to 18 U.S.C. § 982(a)(7), a sum of money equal to $16,000 in United States currency, representing proceeds traceable to the commission of said offense (the "Money Judgment").

Plea Agreement at 2.

C. <u>The Shock of the Restitution Order at Sentencing</u>

Appellant was sentenced on April 7, 2025. The news that Gilead had filed a restitution claim against Appellant came as a shock. Even more shocking to him was the finding from the Court that he was responsible for over two million dollars in restitution. $2,388,872.78, specifically. Sent. Tr. at 12-13; A. 181-182.

At no time prior to sentencing was Appellant advised that any Gilead entities were victims in this case. At no time prior to sentencing was he advised that he might be subject to an additional order of restitution, especially an additional order of restitution filed by an organization whose name he had never heard prior to sentencing. Appellant was never told that the Gilead entities filed a request for restitution on January 24, 2025, nor that the Court issued a scheduling order on February 11, 2025, directing counsel to respond on or before February 26, 2025. Affidavit ¶¶ 11-13; A. 226.

When counsel tried, belatedly, to object to the restitution, the Court replied, "Your objection was due February 26 of 2025. I entered an order to that effect, Mr. Kushner. You have waived your objection." Sent. Tr. at 14; A. 183. When he objected, the Court responded, "Your objection is noted, and I note, as well, that your objection is untimely, and you've waived it. But in any event, it's overruled." *Id*.

Counsel should have begged the Court's indulgence and acknowledge that this restitution matter was news to the client. He should have asked to reschedule the restitution hearing for an opportunity to be heard on the merits. Instead, he whispered to the client, "She can't do that." Affidavit ¶ 14; A. 226.

Appellant accepted responsibility for his actions, pled guilty in accordance with a negotiated agreement, and paid in advance the restitution amount specified

therein. He did so in good faith, and with the understanding—never contradicted by counsel until the moment of sentencing—that this represented the entirety of what the law required of him by way of financial redress. The sudden imposition of a much larger restitution order at sentencing, based on a claim he had never been permitted to see, challenge, or even know about, is a result that cannot stand without leaving a stain on the proceedings.

D. Appellant Files Motion for Reconsideration

Less than a month later, on May 6, 2025, Appellant, represented by new counsel, filed a Motion for Reconsideration, seeking relief from what he viewed as an excessive and improperly imposed restitution award. The Court gave a straightforward response on May 16, 2025: while acknowledging that it "would be inclined to consider the motion" on its merits, the Court denied the motion due to jurisdictional concerns arising from a pending appeal. ECF 492; A. 71.

This preliminary expression of receptivity to reconsidering Gilead's financial award becomes particularly significant in light of what followed.

E. A Remand—and a Recusal

The jurisdictional obstacle was soon removed. On June 10, 2025, this Court granted a limited remand specifically empowering the District Court to rule on the pending Motion for Reconsideration.

However, just five days earlier, on June 5, 2025, the District Court's managed brokerage account held shares of Gilead Sciences stock. This was revealed on July 22, 2025, in an Order with Respect to Judicial Disclosure. *Hernandez*, ECF 517. A. 228. On June 11 and 12, 2025—immediately following this Court's grant of jurisdiction to reconsider Gilead's award—additional Gilead holdings appeared in the District Court's portfolio. An initial filing represented that the District Court's total position was worth nearly one million dollars. The District Court directed any party who had questions—or wanted to file a motion with respect to this disclosure—to do so on or before July 28, 2025. *Id.*

In other words, it was precisely during this critical window—when the District Court's authority to revisit Gilead's multimillion-dollar award had been restored—that the District Court's financial interest in the beneficiary company reached its peak.[2] Considering this disclosure, Appellant Hernandez moved for the District Court to recuse itself. *Hernandez*, ECF 522.

The following day, in an Order with Respect to Updated Judicial Disclosure, the District Court noted that, "[b]ased upon the Hernandez motion [for recusal], it became apparent that there were certain material typographical errors in the Court's July 22 disclosure." *Hernandez*, ECF 523 at 1; A. 230. "Specifically, the Court's

---

[2] The District Court took no action upon remand until June 24, 2025, and only after Appellant filed a letter request for post-remand review of the merits of his motion for reconsideration on June 22, 2025. *Hernandez*, ECF 505.

judicial disclosure on July 22, 2025 inadvertently left out the decimal points when disclosing the quantity of shares purchased." *Id*. at 2; A. 231.

In a filed response, counsel for Appellant noted that Appellant had requested extension of his surrender date given the pending Motion for Reconsideration, and the Court had not made a decision on this request despite the fact it was timely submitted, and the surrender date was only days away. "While Mr. Hernandez is prepared to serve the jail sentenced that was imposed upon him," noted counsel, "the surrender date uncertainty is disconcerting, to say the least, and might suggest a lack of judicial sensitivity. These factors do little restore the defendant's confidence in the Court's decision making. And it is likely that the general public would find his concerns reasonable." *Hernandez*, ECF 527 at 2.

The District Court recused itself on August 26, 2025. *Hernandez*, ECF 534; A. 233-241. The case was reassigned the following day to a new District Court. Upon the new District Court's request for a letter "advising the Court of the status of the case and whether there is anything the Court should do…beyond deciding the pending motion for reconsideration," Appellant renewed his request for extension of the surrender date given the pending Motion for Reconsideration. *Hernandez*, ECF 537. On September 3, 2025, the District Court extended the surrender date. *Hernandez*, ECF 538.

The District Court denied the Motion for Reconsideration a week later, noting that, "to the extent that Hernandez argues that the District Judge who sentenced him committed error in imposing restitution, he must make his arguments in the first instance to the Court of Appeals." *Hernandez*, ECF 549; A. 244.

Appellant does so now.

## SUMMARY OF ARGUMENT

When a lawyer makes a mistake, it's awkward, both for the lawyer and for the client. But it is incumbent upon the lawyer to own up to his or her error so as not to harm the client. Here, unfortunately, the lawyer did not, and the client was harmed.

Counsel's failure to reply to Gilead's memorandum in support of an additional order of restitution is particularly troublesome where, as here, the plea agreement included a closed-ended agreement regarding a specific amount of restitution ($16,000), as opposed the somewhat more standard language in a plea agreement that a defendant may be subject to restitution as determined by the sentencing court. Here, both as part of the agreement and at his change of plea hearing, Appellant was told the exact amount of his restitution exposure.

Moreover, the failure to comply with this Court's scheduling order dated February 11, 2025 (*Hernandez,* ECF 435), is particularly egregious given the fact that Appellant has a meritorious claim that he should not be subject to any additional restitution whatsoever. That counsel failed to inform his client of the possibility that he might be subject to an additional order of restitution is simply inexplicable.

# ARGUMENT

## I. APPELLANT WAS DENIED CONSTITUTIONALLY EFFECTIVE ASSISTANCE OF COUNSEL IN VIOLATION OF THE SIXTH AMENDMENT.

The Sixth Amendment right to counsel is the right to the effective assistance of counsel. Prior counsel's failure to comply with the District Court's scheduling order, dated February 11, 2025 (*Hernandez*, ECF 435), is particularly egregious given the fact that Appellant has a meritorious claim that he should not be subject to any additional restitution whatsoever. That counsel failed to inform his client of the possibility that he might be subject to an additional order of restitution is simply inexplicable, a violation of his right to due process, and set into motion a confused and flawed process that resulted in an improper restitution order.

A. Standard of Review

This Court has treated ineffective assistance of counsel as a mixed question of law and fact, which ordinarily receives *de novo* review. The Court applies freshly the test articulated in *Strickland v. Washington*, 466 U.S. 668 (1984), without deference to the lower court's legal conclusions, though it would defer to any factual findings for clear error. Though it generally encourages such claims to be raised in petitions pursuant to 28 U.S.C. § 2255, properly addressed to the district court, the Second Circuit has entertained ineffective assistance claims for the first time on direct appeal when their "resolution is 'beyond any doubt' or to do so would be in

the interest of justice." *United States v. Matos*, 905 F.2d 30, 32 (2d Cir. 1990). And in this matter, the original District Court has recused itself from the case.

### B. Constitutionally Ineffective Assistance of Counsel Led to the Issuance of an Improper Restitution Order

It is well established that a defendant's Sixth Amendment right to the effective assistance of counsel is governed by the two-part test articulated in *Strickland*.. To prevail, a defendant must show, first, that counsel's deficient performance fell below an objective standard of reasonableness, and second, that there is a reasonable probability that, but for counsel's errors, the outcome would have been different. This is not an abstract or speculative exercise. The Sixth Amendment does not guarantee perfect representation, but it does require competent advocacy. Here, counsel's failures were neither strategic nor excusable. They were egregious—and the prejudice to Appellant is plain.

Defense counsel's performance was objectively deficient by any reasonable measure. The Court issued a scheduling order directing the parties to respond to a significant claim for restitution. Counsel ignored it. Gilead filed a memorandum seeking more than two million dollars. Counsel did not respond. He never advised his client of the claim, never conducted any investigation into its factual or legal basis, and never requested a hearing. He did not file a single page of opposition. He did not ask for an adjournment or otherwise attempt to preserve his client's rights. At sentencing, when confronted with this last-minute claim and the Court's

statement that the objection had been waived, counsel responded not with advocacy, but with, quite literally, a shrug and a whisper. This was not the exercise of professional judgment. It was an abdication of duty.

The prejudice resulting from this failure is not speculative—it is devastatingly concrete. Had counsel responded to the Court's order, he could have raised the obvious legal defects in Gilead's claim: the inapplicability of the Mandatory Victims Restitution Act (MVRA) to Appellant's offense, the lack of prosecutorial support, the absence of any causal nexus, and the speculative nature of the damages calculation. Had counsel informed his client of the claim, he could have worked with him to prepare a defense, present evidence, or negotiate a resolution. Instead, Appellant was blindsided. A $16,000 restitution obligation ballooned into a $2,388,872.78 judgment—entered without briefing, without adversarial testing, and without even the client's knowledge. The prejudice here is not merely probable; it is manifest. It is measurable. And it warrants relief.

C. <u>The Failure to Notify Appellant of the Possibility of a Restitution Order Was Not Harmless</u>

Restitution, though compensatory in nature, is a penalty imposed in a criminal proceeding—and as such, it implicates the full protections of the Due Process Clause. At a minimum, due process requires that an individual be given *notice* of the claims against him and a *meaningful opportunity to be heard* before he is deprived of property. *See Mathews v. Eldridge*, 424 U.S. 319, 333 (1976). These basic

guarantees are not aspirational; they are foundational. They ensure that legal process remains adversarial, transparent, and fair. When those guarantees are disregarded, the legitimacy of the proceeding itself is called into question.

Here, those protections were not merely impaired—they were absent. Appellant received no notice that Gilead was claiming victim status in his case. He was never advised that a restitution memorandum had been filed. He had no opportunity to challenge Gilead's legal standing, to scrutinize its damages theory, or to present contrary evidence. No hearing was held. No cross-examination occurred. There was no adversarial testing of the claim whatsoever. The $2.4 million judgment entered against him was the product of *ex parte* filings submitted by a private third party and left entirely unchallenged due to defense counsel's failure to respond. That is not due process. It is process in form only, not in substance.

The Second Circuit has established clear precedent that "the failure to notify the defendant during the plea colloquy of the possibility of an order of restitution is not harmless error under Fed. R. Crim. P.11(h), and is a grounds for vacating the guilty plea." *United States v. Khan*, 857 F.2d 85, 87-88 (2d Cir. 1988) (vacating guilty plea where defendant had no knowledge that sentence might include restitution order and government indicated that it would not ask for victim restitution). "This is true even if the defendant agreed to make restitution payments

in his plea agreement, but was unaware of the court's power to order restitution at sentencing." *United States v. Showerman*, 68 F.3d 1524, 1528 (2d Cir. 1995).

Compounding the harm, Appellant was denied competent representation at the very moment his exposure multiplied 125-fold. The Government declined to support the claim. Defense counsel failed to oppose it. The Court, lacking the benefit of advocacy on either side, proceeded without knowing that the defendant himself had been kept in the dark. The result is a restitution order that carries the force of law but none of its procedural safeguards.

That is precisely the type of outcome the Due Process Clause is meant to prevent.

## II. GILEAD IS NOT A "VICTIM" ENTITLED TO RESTITUTION UNDER THE MVRA, AND THE DISTRICT COURT VIOLATED APPELLANT'S FIFTH AMENDMENT DUE PROCESS RIGHTS BY IMPOSING A RESTITUTION ORDER BASED ON A THIRD-PARTY CLAIM OF WHICH APPELLANT RECEIVED NO NOTICE AND HAD NO MEANINGFUL OPPORTUNITY TO CONTEST.

The Mandatory Victims Restitution Act (MVRA), codified at 18 U.S.C. § 3663A, does not permit independent restitution claims by private litigants. And even if Gilead had the right to seek restitution, its claim cannot withstand scrutiny on the merits.

A. <u>Standard of Review</u>

The standard of review is *de novo*, because the underlying restitution order is premised on a misunderstanding of law. "We review an MVRA order of restitution deferentially, and we will reverse only for abuse of discretion." *United States v. Gushlak*, 728 F.3d 184, 190 (2d Cir. 2013). An abuse of discretion occurs when "a challenged ruling rests on an error of law, a clearly erroneous finding of fact, or otherwise cannot be located within the range of permissible decisions." *United States v. Boccagna*, 450 F.3d 107, 113 (2d Cir. 2006). "Where [a defendant] challenges the district court's finding of facts, we review for clear error; where his arguments raise questions of law, our review is de novo." *Gushlak*, 728 F.3d at 190-91 (internal citations omitted).

B. <u>The MVRA Vests Exclusive Authority in the Government</u>

Even if Gilead had a plausible basis for restitution—which it does not—it lacks the statutory authority to seek such relief on its own. The MVRA vests the power to demonstrate victim loss exclusively in the hands of the Government. *See* 18 U.S.C. § 3664(d)(5); The burden is on the Government to prove the amount of the victim's loss by a preponderance of the evidence. This is not a procedural technicality; it is a structural guarantee of due process and prosecutorial discretion. "When the language of a statute is unambiguous, judicial inquiry is complete."

*United States v. American Society of Composers, Authors & Publishers*, 627 F.3d 64, 72 (2d Cir. 2010) (internal quotation marks omitted).

Restitution may be ordered only for losses caused by an offense of conviction. *United States v. Cadet*, 664 F.3d 27, 34–35 (2d Cir. 2011). And it may only be ordered when authorized by statute. *United States v. Helmsley*, 941 F.2d 71, 101 (2d Cir. 1991). Thus, "'the loss caused by the conduct underlying the offense of conviction establishes the outer limits of a restitution order.'" *United States v. Oladimeji*, 463 F.3d 152, 158 (2d Cir. 2006) (quoting *Hughey v. United States*, 495 U.S. 411, 420 (1990)). The role of a "victim" under the MVRA is limited. Private litigants do not have standing to litigate restitution claims in criminal cases. The Government is the gatekeeper. As numerous courts have recognized, including in *United States v. Stoerr*, 695 F.3d 271 (3rd Cir. 2012), victims are beneficiaries—not parties—and they lack any independent enforcement rights under the MVRA. The statute repealed earlier provisions that allowed direct victim enforcement, deliberately restoring discretion and control to federal prosecutors. This language is unambiguous: the attorney for the Government bears the burden of proof.

This is not merely about roles; it is about the integrity of the adversarial process. Government screening provides a necessary check on speculative or inflated claims, and it ensures that restitution awards are grounded in causation, legality, and evidence—not corporate self-advocacy. Where, as here, the

Government deliberately refrains from pressing a claim, no private actor may step in and do so. The MVRA permits no workaround. Gilead's submission is procedurally improper, substantively unsupported, and legally unauthorized.

### C. The Government's Exclusive Role Serves Critical Functions

The Government's exclusive role in advancing restitution claims is not merely a procedural convenience—it serves foundational functions rooted in both constitutional structure and fundamental fairness. First, the principle of separation of powers demands that prosecutorial discretion remain within the executive branch. It is the federal government, not private entities, that is tasked with evaluating the merits of restitution claims in criminal proceedings. Allowing private parties to circumvent that gatekeeping function—and to press restitution claims independently—threatens to collapse the constitutional wall separating prosecutorial authority from judicial administration. Courts are not meant to become arbiters of civil-style damages disputes cloaked in the mantle of criminal sentencing.

Second, due process requires that criminal defendants face only those claims that have been vetted and endorsed by the Government. Prosecutorial advocacy serves as a critical safeguard, filtering out speculative, excessive, or legally unsupported demands before they reach the sentencing judge. In its absence, the defendant is forced to defend against untested assertions made by private interests that may have neither the obligation to disclose exculpatory facts nor the institutional

constraints that apply to government attorneys. That is not the adversarial process the Constitution contemplates.

Finally, the integrity of the criminal justice system relies on adversarial testing. Restitution is not a clerical function—it is a serious financial penalty that must be grounded in law, fact, and fairness. When the Government steps aside, that testing does not occur. Claims go unchallenged, and defendants are deprived of the opportunity to confront the allegations against them through counsel, cross-examination, and evidence. That is precisely what occurred here. Gilead submitted a complex claim for over two million dollars. The Government chose not to support it. Defense counsel failed to oppose it. And yet, the claim was granted in full. That breakdown—of process, of role, of responsibility—cannot stand.

### D. The MVRA's Legislative History Confirms Congress's Intent to Centralize Restitution Authority in the Government

Congress's decision to enact the altogether separate Crime Victims' Rights Act (CVRA) in 2004—nearly a decade after the passage of the MVRA—confirms that the MVRA was never intended to grant victims independent standing to litigate restitution claims. The CVRA, codified at 18 U.S.C. § 3771, was designed to fill perceived procedural gaps in victims' rights by creating a limited set of enforceable protections: the right to be heard at certain critical stages, the right to confer with the Government, and the right to reasonable notice. But it stopped short of granting

victims the power to litigate substantive claims or to act independently of the government in criminal proceedings.

Indeed, the CVRA reaffirmed the existing prosecutorial framework, reinforcing the principle that the Government alone determines which claims are advanced and on what legal basis. *United States v. Sullivan*, 118 F.4th 170 (2d Cir. 2024), makes this distinction clear: even under the CVRA, victims do not gain the authority to independently prosecute, contest, or enforce restitution claims. Even following the adoption of the CVRA, a crime victim for the purposes of restitution remains "a person directly and proximately harmed as a result of the commission of a Federal offense." 18 U.S.C. § 3771(e). And the inquiry to determine whether an individual is a victim as defined by the statute is fact specific. *See*, e.g., *In re Rendon Galvis*, 564 F.3d 170, 175 (2d Cir. 2009).

In any event, the role of victims is participatory, not adversarial. They may be consulted, may submit statements, and may request certain procedural accommodations—but they may not insert themselves into the sentencing process in lieu of the Government. To permit otherwise would be to convert victims into private prosecutors, undermining both prosecutorial discretion and the coherence of federal sentencing practice.

This division of responsibility is not accidental—it is the product of deliberate legislative design. The MVRA expressly repealed prior statutes that had permitted

direct victim enforcement of restitution. *See* Catharine M. Goodwin, *Federal Criminal Restitution* § 15:10 (2024). Congress did not leave the question open. It made a considered judgment to centralize restitution litigation within the Department of Justice, rather than allow victims to press their own claims in criminal court. That structural choice reflects an understanding that restitution, unlike civil damages, is an arm of sentencing—a core judicial function that demands prosecutorial filtering and evidentiary rigor.

By repealing earlier provisions that allowed victims to act as private litigants, and then passing the CVRA to provide procedural rights without granting adversarial standing, Congress established a coherent, tiered approach: victims may be heard, may consult, may object—but they may not prosecute restitution claims themselves. Gilead's effort to act as a stand-in for the Government, without the Government's support, is thus not only inconsistent with case law—it is flatly inconsistent with the statute itself.

## III. THE DISTRICT COURT EXCEEDED ITS AUTHORITY BY ORDERING RESTITUTION IN AN AMOUNT GREATER THAN THE $16,000 TO WHICH APPELLANT SPECIFICALLY AGREED IN HIS PLEA AGREEMENT, WHERE NO OPEN-ENDED RESTITUTION PROVISION WAS INCLUDED.

### A. Standard of Review

The Second Circuit reviews interpretations of plea agreements *de novo* and in accordance with principles of contract law. *United States v. Riera*, 298 F.3d 128,

133 (2d Cir. 2002). To determine whether a plea agreement has been breached, the Court "look[s] to the reasonable understanding of the parties as to the terms of the agreement." *United States v. Colon*, 220 F.3d 48, 51 (2d Cir. 2000). Because the Government "'ordinarily has certain awesome advantages in bargaining power,'" any ambiguities in the agreement must be resolved in favor of the defendant. *United States v. Padilla*, 186 F.3d 136, 140 (2d Cir. 1999) (quoting *United States v. Ready*, 82 F.3d 551, 558-59 (2d Cir. 1996)).

B. The Government Waived Any Right to Seek Additional Restitution

The Government's own conduct throughout this case underscores a clear and consistent position: Appellant's restitution obligation was capped at the negotiated $16,000. That was the figure memorialized in the plea agreement, emphasized at the change of plea, and reiterated at sentencing. In its sentencing submission, the Government identified only two categories of victims—government insurance programs and the patients of the involved pharmacies—and did not mention Gilead or any other pharmaceutical manufacturer. At no point did the Government endorse, advance, or even acknowledge Gilead's claim for restitution. It remained silent in the face of a multimillion-dollar demand. Indeed, the Government's silence was a tacit acknowledgment that advancing Gilead's claim, regardless of the merits, would constitute a material breach of the plea agreement. Doing so now would have the same consequences.

This silence was not merely passive; it operated as a functional waiver. By choosing not to respond to the Court's February 11 scheduling order—despite being directed to do so—the Government relinquished its opportunity to weigh in. It is black-letter law that the Government bears the burden of proving restitution under the MVRA. Where it chooses not to carry that burden, the claim fails.

Further, judicial estoppel bars any subsequent effort by the Government to pivot toward supporting a claim it long disavowed. Having induced Appellant's plea by representing the restitution exposure as fixed and finite, the Government cannot now seek to rewrite the bargain. *See New Hampshire v. Maine*, 532 U.S. 742, 749 (2001). Due process demands consistency from prosecutors. *See Santobello v. New York*, 404 U.S. 257 (1971). If the Government believed additional victims existed, it had an obligation to identify them during plea negotiations or sentencing advocacy. The Government's strategic silence, both at sentencing and in the face of Gilead's filings, must be taken as a considered decision—one that bars any future attempt to resuscitate Gilead's claim under the guise of delayed advocacy.

Indeed, to determine whether a person qualifies as a "victim," a district must: (1) "identify[ ] the nature and scope of the 'offense' on which restitution is based," and (2) evaluate "cause-in-fact and proximate cause." *United States v. Goodrich*, 12 F.4th 219, 228–29 (2d Cir. 2021). Courts "look to the materials supporting the plea—such as the allocution statement, the plea agreement, and the indictment—to

ascertain the 'offense of conviction' for restitution purposes." *Id.* at 230. But it is the Government that bears the burden of "proving causation," *id*. at 231, and "the amount of the loss sustained by a victim as a result of the offense." 18 U.S.C. § 3664(e).

The Government's failure to advocate for Gilead's claim represents a considered prosecutorial judgment. When prosecutors decline to advance restitution claims, that decision reflects professional assessment of evidence, causation, and justice considerations. Courts should not permit private parties to circumvent such judgments.

C. <u>Gilead's Claim Fails on the Merits</u>

Even assuming Gilead had the right to seek restitution—and it does not—its claim cannot withstand scrutiny on the merits. Appellant was not charged with trademark infringement, counterfeiting, or any related offense. He was not named in Gilead's pending civil enforcement action, nor was his conduct ever described by the Government in such terms. Instead, he was charged with a single count of conspiracy to violate the Anti-Kickback Statute and played a limited role as a delivery runner in that scheme.

Here, Appellant has neither been charged with criminal trademark infringement, nor otherwise convicted of it. As explained, he was charged in a single count of a multi-count, multi-defendant indictment with an 18 U.S.C. § 371 anti-

kickback conspiracy, in violation of 42 U.S.C. § 1320a-7b(b)(2)(B) . He was the only co-defendant charged with a single count.

Moreover, tellingly, Appellant is one of only two named defendants that were *not* also named in a related civil enforcement action filed by Gilead that is pending in the Eastern District of New York before the Honorable Natasha C. Merle. *See Gilead Sciences, Inc.*, *et al. v. Khaim, et al.*, Case No. 24 Cv. 4259 (E.D.N.Y. Jun. 17, 2024). The civil litigation in the Eastern District involves allegations of trademark infringement and related Lanham Act claims of counterfeiting, none of which have anything whatsoever to do with Appellant.

Likewise, Gilead at no time was identified by the Government as a victim of the kickback conspiracy offense to which Appellant pleaded guilty. *See Hernandez*, ECF 457 at 3, Letter Memorandum (March 31, 2025) (the kickback conspiracy "had two sets of victims: government insurance programs and the patients of the pharmacies").

"[R]estitution can only be imposed to the extent that the victims of a crime are actually identified." *United States v. Catoggio*, 326 F.3d 323, 328 (2d Cir. 2003); *see also United States v. Reifler*, 446 F.3d 65, 121 (2d Cir. 2006) ("Section 3663A(a)(1) does not authorize the court to order a defendant to pay restitution to any person who was not a victim of the offense of which the defendant was convicted"). In short, Gilead has grouped Appellant together with others who were

charged with and convicted of offenses for which he is neither criminally nor civilly responsible.

Equally problematic is Gilead's damages model, which assumes that every dispensed bottle represents a lost sale. That is not the law. "The purpose of restitution is to compensate victims for their losses." *United States v. Pescatore*, 637 F.3d 128, 138 (2d Cir. 2011).

The MVRA does not allow for windfalls, speculative harms, or lost opportunities. The restitution must reflect actual, provable loss, proximately caused by the defendant's offense of conviction. Here, there is no causal nexus, no evidence of individualized harm, and no justification for the breathtaking sum awarded. The absence of any adversarial testing of Gilead's claim only deepens the infirmity. That such a claim could pass through sentencing without endorsement by the Government or participation by the defense underscores the need for reconsideration.

In any event, the grouping of Appellant with other defendants is the legal equivalent trying to hammer a square peg into a round hole. This effort explains why Gilead, in its filings before the District Court, relies on cases that are factually inapplicable: *United States v. Papyan*, Case No. 18 Cr. 533 (RS), 2024 WL 4876945

(N.D. Cal. Nov. 22, 2024) and *United States v. Milstein*, 481 F.3d 132 (2d Cir. 2007).[3]

1. <u>Appellant's Case is Plainly Distinguishable from *Papyan*</u>

Lorik Papyan pleaded guilty on August 10, 2021, to one count of Unlicensed Wholesale Distribution of Prescription Drugs in violation of 21 U.S.C. §§ 331(t), 333(b)(1)(D), and 353(e)(1).

Appellant is plainly distinguishable from Lorik Papyan.

First, "Papyan had numerous roles in the conspiracy, which spanned three different front companies—'Covidien Sales and Distribution,' 'Mainspring Distribution,' and 'RSL Distribution.'" *United States v. Lorik Papyan*, Case No. 18 Cr. 533 (RS), ECF 295 at 1. Here, Appellant had a single role. "While not a pharmacy owner or manager, the defendant played a critical role in the scheme," notes the Government. Appellant was a "prolific 'runner' who delivered diverted medication and cash kickbacks to patients." *Hernandez*, ECF 457 at 1.

Papyan engaged in "devious sophistication." *Papyan* at 1. Appellant did not. He carried drugs in paper bags in which cash was enclosed. Appellant also "bought

[3] The Government also did not specifically comply with the Court's scheduling order of February 11, 2025, seemingly abdicating it statutory responsibility to identify victims and prove restitution claims by a preponderance of the evidence. But inasmuch as the Government, in its sentence memo dated March 31, 2025, did not include Gilead's claim, Gilead's request for addition restitution should have been rejected for that reason alone.

back that same medication from patients, and regularly attempted to recruit new HIV patients to the scheme." *Hernandez*, ECF 457 at 1. The Government noted that several patients "stated in interviews that they at times sold back their HIV medication to [Appellant] Hernandez for approximately no more than $100." *Id*. at 4. This was not sophisticated.

Papyan "helped manufacture a fake electronic trail to conceal the crime." *Papyan* at 2. Appellant did not. Papyan created a false web site as part of his fraud. *Id.* Appellant possessed neither the skills nor the inclination to engage in such conduct.

Papyan "further deluded prospective customers by assisting in creating fake paper record of correspondence between fictitious suppliers to enhance the veneer of legitimacy for customers." *Id*. at 2. Appellant did not.

Papyan "helped prepare drugs for reintroduction into the supply chain" by "'clean[ing]' the blackmarket drugs, by hand, removing existing labeling using lighter fluid and then relabeling and repackaging the pill bottles for shipment to pharmacies." *Id*. at 3. Again, Appellant did not engage in such conduct. Papyan also worked with a coconspirator to "create fraudulent transactions histories or 'pedigrees,' i.e., paperwork required by federal law to show to sellers the provenance of the drugs." *Id*. at 2. Appellant did not, nor would he know how to do so.

Finally, Papyan "laundered the illicit funds" and "received illegal profits under the guise of renumeration for [] consulting services." Papyan "used his cut to buy (among other things) a $2 million apartment on Wilshire Boulevard in Los Angeles." *Id*. Appellant, once again, possessed neither the skills nor the inclination to engage in such conduct. And he certainly did not make the money to purchase anything close to a luxury home.

Although the fact that Papyan was involved in conduct that is materially and substantially different from Appellant's conduct is the *sine qua non* that cannot realistically be debated, it is hardly the only reason it is of no help to the Government—should it decide to take a different position than it did in its sentence letter.

For example, Gilead was the only victim specifically identified by the Government in Papyan's case and the Government advanced its statutory obligation by submitting a lengthy "restitution memorandum." *Papyan*, ECF 334. In its memorandum, the Government noted that "although Papyan's offense of conviction—Unlicensed Wholesale Distribution of Prescription Drugs—is not enumerated as a restitution offense in the Victim and Witness Protection Act…or a mandatory restitution offense in the Mandatory Victim Restitution Act." Papyan stipulated in his plea agreement to "make a good-faith effort to pay *any…restitution I am ordered to pay*." *Papyan*, ECF 334 at 2 (emphasis added). In its decision

granting the Government's restitution request to Gilead, the court in Papyan also noted that his offense, was "not enumerated as a restitution offense in the Victim and Witness Protection Action…nor a mandatory restitution offense in the Mandatory Victim Restitution Act." *United States v. Papyan*, Case No. 18 Cr. 533 (RS), 2024 WL 4876945, at *2 (N.D. Cal. Nov. 22, 2024) .

While Papyan's was not "enumerated as a restitution offense," since it is well settled that the Victim and Witness Protection Act at 18 U.S.C. § 3663(a)(3) "grants statutory authority to district courts to award restitution whenever a defendant agrees in a plea agreement to pay restitution," he could and was ordered to do so.

Here, as in Papyan's case, Appellant's offense is "not enumerated" as a restitution offense. As a threshold matter, the MVRA does not apply to Appellant's offense of conviction. Under 18 U.S.C. § 3663A(c)(1), the MVRA applies only to specific enumerated offenses: "(A) that is—(i) a crime of violence, as defined in section 16; (ii) an offense against property under this title, or under section 416(a) of the Controlled Substances Act, including any offense committed by fraud or deceit; (iii) an offense described in section 3 of the Rodchenkov Anti-Doping Act of 2019; (iv) an offense described in section 1365 (relating to tampering with consumer products); or (v) an offense under section 670 (relating to theft of medical products)." Appellant pleaded guilty to conspiracy to violate the Anti-Kickback

Statute, in violation of 18 U.S.C. § 371 and 42 U.S.C. § 1320a-7b(b)(2)(B). This offense does not fall within any of the enumerated categories.

And although he agreed to pay restitution in his plea agreement, his agreement was limited to a specific amount, $16,000. Accordingly, the Court had no authority to exceed the amount to which Appellant agreed.

2. Appellant's Case is Plainly Distinguishable from *Milstein*

For much the same reasons, *United States v. Milstein* also does not support Gilead's claim for an additional restitution award.

On April 5, 2000, after a five-week trial, Moshe Milstein was convicted of: (1) conspiracy to traffic in counterfeit prescription drugs, conspiracy to distribute misbranded drugs and conspiracy to distribute prescription drugs as an unlicensed wholesaler, in violation of 18 U.S.C. § 371 (Count One); (2) trafficking in counterfeit prescription drugs, in violation of 18 U.S.C. § 2320(a) (Count Two); (3) distributing misbranded drugs, in violation of 21 U.S.C. §§ 331(a) and 333(a)(2) (Count Three); (4) distributing prescription drugs wholesale without a license, in violation of 21 U.S.C. §§ 331(t), 333(b)(1) and 353(e)(2)(A) (Count Four); and (5) distributing prescription drugs without maintaining the required documentation, in violation of 21 U.S.C. §§ 331(t), 333(a)(2) and 353(e)(1)(A) (Count Five). Clearly, the scope of Milstein's crimes far exceeds those of Appellant.

During the trial, the evidence demonstrated that Milstein and several other individuals, through various business entities, purchased, repackaged, and sold foreign prescription drugs, specifically Eldepryl, which is used to treat Parkinson's disease, as well as the fertility medications Pergonal and Metrodin. The Eldepryl, Pergonal, and Metrodin that were distributed in the United States by these companies had been manufactured and packaged outside the country in accordance with FDA standards. However, the same companies also produced these drugs for distribution outside the United States with different packaging, which did not necessarily adhere to FDA standards. *United States v. Milstein*, 401 F.3d 53 (2d Cir. 2005) (*Milstein I*). Appellant committed no such acts.

The Government also established that Milstein and others engaged in a sophisticated process of drug fraud. They purchased Eldepryl, Pergonal, and Metrodin, which were originally intended for distribution outside the United States. These drugs were then stripped of their original factory packaging, repackaged with counterfeit labels and packaging materials that closely resembled those of drugs produced by FDA requirements for the U.S. market. The drugs were then fraudulently sold in the United States to doctors, pharmacists, and pharmaceutical wholesalers. Milstein's illicit activities began with the distribution of misbranded and counterfeit Pergonal in late 1991, and he later added Metrodin and Eldepryl to his fraudulent operations. Milstein obtained foreign Pergonal, Metrodin, and

Eldepryl from one George Braun at prices lower than those commanded by these drugs when prepared for the U.S. market. *See United States v. Milstein*, 481 F.3d 132 (2d Cir. 2007) *(Milstein II*), ECF 220. Appellant's crime was not sophisticated, nor did it remotely approach Milstein's activity.

In affirming the judgment of the district court in all respects, the Second Circuit approved of the district court's conclusion that Milstein's trademark infringement resulted in "damage to…property" and that restitution for "the value of the property on the date of the damage" was proper and, based on the evidence "made a reasonable estimate of the amount of lost sales." *United States v. Milstein*, 481 F.3d 132, 137 (2d Cir. 2007) (*Millstein II*).

There is simply no comparison between Appellant's conduct and the conduct descriped in *Papyan* and *Milstein*. And there is no causal link between Gilead's claims and Appellant's actions.

3. Both Cases, Taken Together, Mean the MVRA Does Not Apply

Because Appellant's offense of conviction does not fall within the enumerated categories set forth in 18 U.S.C. § 3663A(c)(1), the Mandatory Victims Restitution Act has no application to this case. Appellant pleaded guilty to a single count of conspiracy to violate the Anti-Kickback Statute, in violation of 18 U.S.C. § 371 and 42 U.S.C. § 1320a-7b(b)(2)(B). That offense is neither a crime of violence, nor an offense against property under Title 18, nor an enumerated fraud or deceit crime

within the meaning of § 3663A. It is a regulatory offense designed to protect the integrity of federally funded healthcare programs—not a property crime intended to redress commercial or economic harms.

As a result, mandatory restitution under § 3663A is categorically unavailable. The only possible source of restitution authority in this context would be the discretionary restitution statute, 18 U.S.C. § 3663. That statute permits restitution in two narrow circumstances: first, where the parties expressly agree to restitution in a plea agreement under § 3663(a)(3); and second, where the court elects to impose restitution under § 3663(a)(1), subject to statutory limitations. Neither applies here. The plea agreement executed in this case includes a specific restitution amount—$16,000—tied to the proceeds of Appellant's offense. It does not reference Gilead or contemplate any restitution to private corporate entities. The amount was fixed, negotiated, and paid in advance of sentencing. That was the bargain struck.

This point alone is dispositive. If the MVRA does not apply—and it does not—then there is no statutory basis for mandatory restitution. And where the plea agreement defines and limits restitution under the discretionary statute, the Court lacks authority to expand it unilaterally at sentencing. A criminal defendant cannot be bound to a financial penalty that exceeds both the statutory framework and the terms of the agreement he accepted. Restitution is not a blank check; it must be rooted in law, supported by fact, and constrained by the terms of conviction. Here,

it was none of those. The additional restitution award must therefore be vacated as a matter of law, irrespective of any further factual or equitable considerations.

Gilead relies on 18 U.S.C. § 3664's post-sentencing amendment procedures, noting that the "90-day temporal limit is not jurisdictional" and citing *United States v. Avenatti*, 81 F.4th 171, 204 (2d Cir. 2023), cert. denied, 144 S. Ct. 2598 (2024). But procedural rules cannot cure substantive legal defects. Section 3664 provides procedures for calculating and enforcing restitution awards when legal authority for restitution exists. It does not create substantive authority to order restitution where none exists. Gilead's claim has substantive legal defects that cannot be overcome through procedural mechanisms. Section 3664 cannot transform an anti-kickback conviction into a trademark infringement case, nor can it create victim status where none exists under the applicable statutes.

4. *United States v. Seabrook* Directly Controls This Case

*Milstein* and *Papyan* plainly do not apply here. Instead, this Court's recent decision in *United States v. Seabrook*, 968 F.3d 224 (2d Cir. 2020), directly controls this case and mandates reversal of Gilead's restitution award. In *Seabrook*, a corrupt hedge fund manager was charged with paying a $60,000 bribe to a crooked union official who, in turn, squandered $19 million of union funds through a reckless investment in the hedge fund. The district court ordered $19 million in restitution to the union based on the investment losses from the broader scheme.

However, because the defendant pled guilty only to defrauding the hedge fund—specifically by submitting a fraudulent invoice for the bribe amount—and not to participating in the broader bribery scheme, and because the wire fraud occurred after the imprudent investment, the $19 million restitution award to the union was error, and this Court reversed. *Seabrook*, 968 F.3d at 237. The Court observed that "Section 3663A(a)(1) does not authorize the court to order a defendant to pay restitution to any person who was not a victim of the offense of which the defendant was convicted." *Seabrook*, 968 F.3d at 236. The Court emphasized that restitution under the MVRA must be tied to the actual offense of conviction, not to an "overarching uncharged scheme." *Id*.

Here, exactly as in *Seabrook*, Gilead seeks restitution based on an uncharged counterfeiting scheme rather than the anti-kickback conspiracy of conviction. Like the union in *Seabrook*, Gilead may have been harmed by other defendants' conduct, but it was not a victim of Appellant's specific offense. In short, only those victimized by the offense of conviction are eligible for restitution.

D. <u>Gilead's Claims Are Speculative</u>

Even if Gilead were entitled to restitution—which, again, it is not—Gilead's alleged evidence of lost profits attributable to Appellant is vastly overstated, questionable on the current records in all related litigations, and otherwise inaccurate.

Gilead's damages theory rests on a chain of assumptions that collapse under scrutiny. It posits that Appellant's minor participation somehow caused 866 bottles of medication to be dispensed by a pharmacy under false pretenses—yet there is no showing that he selected the patients, processed the prescriptions, or played any meaningful role in pharmacy operations. He did not fabricate documents, repackage medications, or profit at any meaningful scale. The comparison to the defendants in *Papyan* and *Milstein* is strained to the point of incoherence.

This Court has held that "a victim's losses must be proximately caused by the defendant's offense." *United States v. Aumais*, 656 F.3d 147, 153 (2d Cir. 2011). Outside very narrow contexts, discussed in *Aumais*, that do not apply here, the proximate cause requirement is particularly stringent. As the Court explained in *United States v. Calderon*, 944 F.3d 72, 95 (2d Cir. 2019), proximate cause "limit[s] the defendant's liability to the kinds of harms he risked by his conduct, the idea being that if a resulting harm was too far outside the risks his conduct created, it would be unjust or impractical to impose liability."

In fraud cases, the result "is akin" to the requirement in federal securities cases that "but-for" causation is insufficient; rather, "loss causation" must also be shown. *Calderon*, 944 F.3d at 95. "And to establish loss causation, 'a plaintiff must allege that the subject of the fraudulent statement or omission was the cause of the actual loss suffered.'" *Id*.

Gilead's theory fails both to establish proximate cause or to meet the loss cause standard. There is no evidence that Appellant's small cash payments (described by the Government as "no more than $100") influenced prescription choices or pharmacy selection in ways that would cause millions in lost sales. Patients still received Gilead-branded medications—the issue was the source, not the brand choice. Gilead provides no evidence connecting Appellant's extremely limited delivery role to 866 specific bottles or any particular dispensing decisions.

Indeed, Gilead's own litigation choices expose the weakness of their theory. While claiming millions in trademark damages from Appellant in criminal court, they conspicuously excluded him from their civil trademark litigation against other defendants. This strategic omission reveals that Gilead's own lawyers recognize his conduct does not support trademark-based claims. Gilead explains that Appellant "Hernandez's role involved bribing patients to fill their prescriptions with Galaxy or another pharmacy that employed him," and notes that "as a coconspirator of [Irina] Polvanova's who assisted in Galaxy's distribution of illegitimate medications, Hernandez is responsible for the 866 bottles of Gilead-branded medication dispensed by Galaxy to patients enrolled in Medicare and Medicaid." *Hernandez*, ECF 430 at 12-13.

Gilead's damages calculation rests on a fundamentally flawed premise—one that is both legally infirm and factually unsupported. According to its submission,

Gilead simply multiplied the number of allegedly diverted bottles attributed to Appellant by the wholesale acquisition cost at the time of sale, less manufacturing costs.

But this method fails on every level.

First, it applies the wrong legal standard. Restitution under the MVRA requires proof of *actual loss*—not hypothetical or theoretical profits that might have been earned under different circumstances. Here, the patients in question still received Gilead-branded medication. They did not switch to competitors, and Gilead's products remained in circulation. The loss, if any, is not of a sale but of control over distribution channels. That may be relevant in a civil Lanham Act case—but not in criminal restitution, which requires pecuniary harm directly caused by the defendant's conduct.

Second, there is no proximate causation. Even accepting that Galaxy Pharmacy dispensed 866 bottles of Gilead medication, there is no evidence—none—that Appellant's conduct was the proximate cause of those transactions. He was not a pharmacist, a prescriber, or a billing coordinator. He delivered medications and occasionally gave small amounts of cash—often $100 or less—to patients. That conduct, while unlawful, is too attenuated to support the conclusion that he was the but-for cause of millions in lost revenue. The Government itself described Appellant as a "runner," not a ringleader.

Third, the proposed methodology would result in impermissible double-counting. Gilead already sold the medication in question into the market. Its loss, if any, has already been recouped through the original transaction. To now demand restitution from Appellant based on the same bottles—without even alleging that the medications were counterfeit, substituted, or ineffective—would grant Gilead a windfall. The MVRA does not entitle corporate victims to collect twice: once through commercial sale, and again through criminal restitution.

Finally, the entire model rests on speculative assumptions about causation, indispensability, and but-for participation. Gilead's claim presumes that Galaxy's operations were dependent upon Appellant's involvement—that, absent his conduct, the entire dispensing activity would have collapsed. That assumption is not only unsupported—it is belied by the record. Appellant played a limited role in a broader scheme. He did not direct operations, did not profit substantially, and had no managerial authority. To assign him personal responsibility for the totality of Galaxy's activity is to distort both the factual record and the governing law.

This principle—that restitution must reflect losses caused by the specific conduct underlying the offense of conviction—is firmly established in Supreme Court precedent. In *Hughey v. United States*, 495 U.S. 411 (1990), the Court held that restitution under the Victim and Witness Protection Act (the statutory predecessor to the MVRA) must be limited to the "loss caused by the specific

conduct that is the basis of the offense of conviction." That holding has been repeatedly reaffirmed in MVRA cases. The restitution statute does not authorize broad equitable remedies, nor does it permit sentencing courts to impose liability based on uncharged or tangentially related acts. The burden remains on the government—not on a private party—to establish, by a preponderance of the evidence, a direct and proximate causal link between the defendant's criminal conduct and the victim's loss. Here, there is no such link. Appellant's conduct was narrow in scope, limited in duration, and confined to a delivery role. To hold him responsible for commercial losses untethered to his actual participation is to ignore *Hughey* and collapse the line between restitution and retribution.

E. Gilead's Admission of Extensive Kickback Violations Undermines Any Claim to Victim Status

On July 1, 2025—just days before Appellant's motion to reconsider was filed—Gilead Sciences, Inc. executed a $202 million settlement agreement with forty-nine state attorneys general, formally admitting to conducting its own extensive kickback scheme in violation of federal anti-kickback laws. This development is not merely relevant to the Court's consideration of this motion; it is dispositive of Gilead's claim to victim status and restitution. Emily Cousins, "$202M Settlement Approved: 49 Attorneys General Strike Deal with Gilead," *The Legal Intelligencer* (July 15, 2025). A. 245-246.

In the settlement agreement, Gilead admits, acknowledges, and accepts responsibility for the following conduct, starting from January 1, 2011, through November 17, 2017. Gilead paid 548 healthcare providers over $23.7 million in honoraria, plus meals and travel expenses, to induce them to prescribe Gilead's HIV medications in violation of the Anti-Kickback Statute. Gilead conducted over 17,300 "HIV Speaker Programs"—over 9,500 of which were dinner programs at high-end restaurants—designed to induce prescriptions through remuneration. Gilead held 157 programs at the James Beard House, along with others at similarly expensive venues like Del Posto and Asiate. It paid approximately sixty healthcare providers over $100,000 each in kickbacks, with one provider receiving over $300,000 while generating over $6 million in Medicare, Medicaid, and TRICARE payments. Settlement Agreement, *United States of America et al., ex rel. Dr. Paul Bellman v. Gilead Sciences, Inc.*, Case No. 16 Cv. 6228 (PAE) (S.D.N.Y. 2025), A. 247-261.

Crucially, this single speaker generated more Medicare and Medicaid payments than Appellant could have influenced in a lifetime.

Indeed, Gilead's own policies and procedures "failed to prevent Sales Representatives and Regional Directors in its HIV therapeutic area from improperly providing honoraria payments, meals, and travel expenses to healthcare providers

who spoke at or attended HIV Speaker Programs to induce them to prescribe the Gilead HIV Drugs." *Id.* at 2-5. A. 248-251.

The timing of this settlement is particularly significant. Gilead's admitted kickback scheme operated from 2011 through 2017, overlapping with and preceding the conduct underlying Appellant's 2023 charges. While Appellant delivered medications with small cash payments that the Government described as "no more than $100," Gilead was simultaneously operating a $23.7 million kickback enterprise targeting the same healthcare system.

The settlement agreement destroys Gilead's victim credibility. Indeed, it exposes the profound hypocrisy of Gilead's restitution claim. The company now seeks $2.4 million from a delivery driver who carried small cash payments in paper bags, while having just admitted to paying tens of millions in sophisticated kickbacks to healthcare providers.

The settlement agreement's formal admissions establish that Gilead was not a victim of healthcare fraud—it was a perpetrator. A company that admits to violating the same anti-kickback laws that formed the basis of Appellant's conviction cannot credibly claim victim status for conduct that pales in comparison to its own admitted violations.

And Gilead's own admitted violations undermine any claim of proximate causation. The company's settlement reveals that healthcare providers were already

being induced to prescribe Gilead medications through the company's own multimillion-dollar kickback program. *United States v. Seabrook*, 968 F.3d 224 (2d Cir. 2020) establishes that only those actually victimized by the offense of conviction are eligible for restitution. A company that admits to conducting its own kickback scheme cannot reasonably claim to be a victim of kickback-related conduct.

The disparity between Gilead's admitted conduct and the restitution it seeks from Appellant shocks the conscience. Gilead paid $23.7 million in kickbacks over six years in a sophisticated scheme involving luxury venues and six-figure payments. Appellant delivered medications in paper bags with small cash payments as a "runner." Gilead's agreed to a settlement of $202 million to resolve claims—and yet believes asserts that a runner like Appellant owes Gilead $2.4 million. This is not justice—it is a corporate entity that engaged in systemic fraud seeking to recover from a low-level participant in a smaller scheme the very type of conduct the corporation perpetrated on a massive scale.

F. To Address This Error, this Court Should Vacate the Conviction and Remand to the District Court

As this Court has previously noted, vacatur of only the restitution portion of an appellant's sentence is "a form of relief that [the Court of Appeals] cannot provide." *United States v. Camara*, 175 F.3d 1008 (2d Cir. 1999) (unpublished).

Should the Court find reversible error, "[t]he only relief available…would be a remand to the district court for resentencing." *Camara*, 175 F.3d 1008. On remand, the district court would, among other options, be able to "reduce the restitution to the lesser sum (as to which [the appellant] was advised at the plea allocution), and then either adhere to the sentence in all other respects, or resentence [the appellant] to any legal prison term."

In *United States v. Showerman,* 68 F.3d 1524, 1529 (2d Cir.1995), this Court noted that "an appellant alleging that the restitution portion of a sentence was improper might not want the only relief available—a remand for resentencing—and instead might prefer to withdraw the appeal." Consistent with *Showerman* and *Camara*, undersigned counsel has conferred with Appellant and determined that Appellant, "fully apprized of the resentencing risks he will face on remand," seeks relief in this appeal. *Camara*, 175 F.3d 1008. Appellant consents to resentencing and is aware that it could result in a different sentence that is more severe, less severe, or the same, including the length of his imprisonment.

## **CONCLUSION**

No criminal defendant is entitled to a perfect process. But every criminal defendant is entitled to a fair one. Here, through no fault of Appellant, that fairness collapsed at the moment of sentencing. A restitution claim by a corporate entity was introduced into the case after the plea had been entered, after the agreed-upon restitution had been paid, and without any notice to the accused. Appellant's counsel failed to respond to the Court's scheduling order, failed to notify his client of the claim, and deprived Appellant of the opportunity to contest it. The result was a restitution order that no adversarial testing preceded and that blindsided the defendant.

That is not justice. It is a miscarriage thereof. And it can surely only be the result of the District Court not being aware that counsel had never discussed the matter with his client.

Given this fundamental error, the Order of Restitution issued by the District Court cannot stand.

Consistent with *United States v. Camara*, 175 F.3d 1008 (2d Cir. 1999) and *United States v. Showerman,* 68 F.3d 1524, 1529 (2d Cir.1995), Appellant, upon conferring with undersigned counsel, has been fully apprised of the resentencing risks he may face on remand.

Accordingly, Appellant respectfully requests that this Court vacate the conviction and remand the matter to the district court for resentencing.

Dated: December 16, 2025
Bayside, New York

Respectfully submitted,

STEVE ZISSOU, ESQ.
*Attorney for Defendant-Appellant*
42-40 Bell Boulevard
Suite 302
Bayside, NY 11361
(718) 541-0716
stevezissou@stevezissouesq.com

SZ/jc

## **CERTIFICATE OF COMPLIANCE WITH FED. R. APP. P. 32(a)**

This document complies with the type-volume limit of Fed. R. App. P. 32(a)(7)(B), the word limit of Local Rule 32.1(a)(4)(B) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 10,883 words.

This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point font Times New Roman.

Dated: December 16, 2025
Bayside, New York